THE ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY v. JOSEPHINE M. NAPOLE.

1. DEATH OF EMPLOYEE—*Duty of Employer.* It is the duty of a railroad company not only to furnish reasonably safe machinery and appliances for the operation of its road, but to use reasonable care and diligence to maintain them in such condition.

2. DEFECTIVE TOOL— *Company, when Negligent—When Not.* Where a defect in a tool or instrumentality is one which suddenly appears, the company will not be deemed to be negligent unless it is remiss in testing the tool or instrumentality, or knew or ought to have known of the defects which caused the injury.

3. COMPANY, *Negligent.* In the present case a recovery was sought for an injury to an employee resulting from a defect in a hand-car, and it appeared that those in charge of the men who were using the hand-car had actual knowledge of the defect. *Held,* That those to whom notice of the impairment was brought represented the company, and that it is bound by their knowledge and held for their negligence.

4. CIVIL CODE, § 422 — *Action by Non-resident.* Chapter 131 of the Laws of 1889, which is supplemental to § 422 of the civil code, does not create a new cause of action nor impose any limitation on an existing one. It simply changes the remedy by providing that a cause of action given by § 422 shall not be lost on account of the non-residence of the deceased or non-appointment of a personal representative. (*Berry v. Railroad. Co.,* 52 Kas. 769.)

26—55 KAS.

*Error from Wyandotte District Court.*

ACTION by *Josephine M. Napole* against *The Atchison, Topeka & Santa Fe Railroad Company* to recover damages for the death of her husband, Francesco Napole, alleged to have been caused by the negligence of the company. A trial was had with a jury, and upon the testimony submitted the following special findings of fact were made and returned by the jury:

"Ques. 1. Was the deceased, Francesco Napole, a section-hand and laborer on section-work on the line of defendant's road, in the county of Leavenworth, Kansas, in the month of August, 1888? Ans. Yes.

"Q. 2. How long had said Francesco Napole been in the employ of defendant company at the date of his injury, on or about August 13, 1888? A. Thirteen days, about.

"Q. 3. In such employ, was it the custom of the section-men to ride upon hand-cars to different localities on the section on which they were employed to work? A. Yes.

"Q. 4. Was such hand-car one of the tools or apparatus used by section-hands in the work on the track and road-bed? A. Yes.

"Q. 5. Was the said hand-car used for the purpose of carrying the section-men to and from their work, and to facilitate travel from one point to another? A. Yes.

"Q. 6. Was William Fitzgerald the foreman of a special gang doing ditching-work on which said Francesco Napole was at work? A. Yes.

"Q. 7. Was the duty of said Napole, as such section-hand, to assist, under the direction of said foreman, in the ditching-work? A. Yes.

"Q. 8. Was it a part of the work of such hands in the work to level the road-bed with dirt and clean out the ditches along the right-of-way, put in ballast, cut weeds, grass and other growth from the right-of-way? A. Yes.

"Q. 9. Was the injury to said Napole, alleged in plaintiff's petition, caused by a fall from a hand-car, while running on said section, on or about the 13th day of August, 1888?  A.  Yes.

"Q. 10.  How long had said hand-car been in use on said section at the time of said injury?  A.  About 13 days.

"Q. 11.  At the time said car was furnished for said use on said section, was said car in good repair and suitable for the use for which it was intended?  A. Yes.

"Q. 12.  Is it a fact that no report had been given to the roadmaster on that division of defendant's road that said hand-car had became out of repair or in bad order prior to said injury?  A.  Yes."

"Q. 14.  Is it a fact that, on the day of this accident, said hand-car was run about 15 miles or more, prior to the accident, and the handles were used by the section-men in going 10 miles to their work in the morning and some five miles, or more, in return at night, before the accident happened that caused the fall of Napole?  A.  Yes.

"Q. 15.  Is it not a fact that the fall of said Napole from the said hand-car was caused by the handle suddenly breaking, without apparent cause therefor? A.  Yes.

"Q. 16.  Is it not a fact that when the men started to work, the morning of the accident, 10 men rode on the car, and that the handle appeared to be all right and safe for use?  A.  Yes."

"Q. 18.  How many men were on said car at said time?  A.  Ten men.

"Q. 19.  Was said hand-car put in motion or propelled along said track by men standing thereon taking hold of the handles fastened into a lever, and pushing up and down on said lever?  A.  Yes.

"Q. 20.  At the time of this alleged injury to said Napole, how many men had hold of the handles of the car from which said Napole fell?  A.  Six men.

"Q. 21.  Did the said Napole, deceased, have hold of the handle which broke at the time it broke?  A. Yes.

"Q. 22. How many miles had they run with this car on that trip, from the time they left the place of that day's work to the place where said accident happened? A. About five miles.

"Q. 23. How far did the car run that morning from Lansing, to reach the place of that day's work? A. About 10 miles.

"Q. 24. When they started to their work in the morning of the day said injury occurred, and on the return trip at night, was there anything about the handles of said car to indicate that the handle was not sound or strong enough for the use to which it was put? A. No.

"Q. 25. Is it not a fact that in the use of said hand-car on said day prior to said injury there was nothing to indicate that the handle was unsound or might break if used? A. No.

"Q. 26. Is it not a fact that the sudden breaking of said handle that caused the fall of said Napole was from a severe jerk or more than the usual amount of strength used at the time? A. No.

"Q. 27. Is it not a fact that another hand-car, at the time of the accident, was following at some distance behind the one on which Napole was riding, on the same track, carrying the same number of men as the car on which Napole was riding? A. Yes.

"Q. 28. Is it not a fact that the men were in the habit of taking either car they chose, without special directions from the foreman or boss of the work, in starting out to their work and returning from it? A. Yes.

"Q. 29. Is it not a fact that the force applied that broke the handle was caused by the men on the car trying to make it run faster, to get back to Lansing, where they boarded and lodged, before the arrival of a train then about due? A. No.

"Q. 30. Was the hand-car in question used the Sunday before said injury by some of the section-men taking it to the city of Leavenworth on their own accord? A. Yes, with permission.

"Q. 31. While at Leavenworth, beyond the boundaries of their section, was said hand-car removed from

the track and left in a position where the handle could be struck by a passing train or engine? A. Yes.

"Q. 32. When said men returned to said car at Leavenworth, had one of the handles been bent during their absence? A. Yes.

"Q. 33. Was said handle straightened by said men in such manner that it looked apparently as straight and sound and suitable for use as it did before it was bent? A. Apparently it did.

"Q. 34. After said trip to Leavenworth, and said handle had been straightened, was said car used by said section-foreman, Fitzgerald, and did he and the hands using the car believe said car was sound and in good condition for use? A. Yes; the men thought so, but we have no evidence what Fitzgerald thought or knew.

"Q. 35. Was any notice given to the proper agent of defendant company after said trip to Leavenworth and prior to said injury that said car had become out of repair in such manner as to make it unfit for use? A. Yes.

"Q. 36. If you answer question 35 in the affirmative, state what agent it was and the time and what notice was given. A. Fitzgerald, the foreman, saw said car and rode on it after injured.

"Q. 37. Was any request made of defendant by said Napole or any of the section-hands to repair said car prior to said injuries? A. No.

"Q. 38. Was one Andrew Lupois on the car that went to Leavenworth the Sunday prior to the accident? A. Yes.

"Q. 39. Did he see the handle in its alleged bent condition? A. Yes.

"Q. 40. Did he see or know of his own knowledge of said handle being straightened? A. Yes.

"Q. 41. Did he see said car after said handle was straightened? A. Yes.

"Q. 42. Did not said Lupois ride from Lansing to the place of work on said hand-car on the morning of the day of the accident, after he knew it was bent and straightened? A. Evidence did not show what car he rode on.

"Q. 43. Did any of the men that rode on said hand-car to their work on the morning of the day the accident happened make any complaint or object to using the same?    A.   No.

"Q. 44. Was the appearance of said car on the day of the accident and prior to the accident in such condition as to appear to any one of the section-men or to the section-foreman to be unfit for use?    A.   It appeared so to the section-men, but no evidence to show what foreman thought.

"Q. 45. What, if any, were the defects in said car that were apparent to those operating it?    A.   None.

"Q. 46. Is it not a fact that said Francesco Napole was standing on said car with his face toward the rear, toward the hand-car that was following the car on which he was riding?    A.   Yes.

"Q. 47. If the rear car should gain speed on the front car, could not said Napole from his position on the car have readily seen the approach of the rear car? A.   Yes.

"Q. 48. Was said Napole and others using said handle at the time, using more force on the handle than was used on that day prior to the time it broke? A.   No.

"Q. 49. Was said Napole pulling on said handle steadily and smoothly or was he exerting great force on said handle by irregular and unsteady jerks?    A. No evidence to show what force was being used.

"Q. 50. Was there any evidence of having any old breaks or cracks in the iron bar in the place where it broke at the time of the accident?    A.   No.

"Q. 51. How long had said car been in use?    A. No evidence to show how long.

"Q. 52. How long and how wide was the platform of said car?    A.   No exact measurements given.

"Q. 53. How many men could ride on the said hand-car?    A.   Ten men.

"Q. 54. How far did said hand-car run after said Napole fell until it was stopped—how many feet? A.   From three to five feet.

"Q. 55. What distance in feet was it usual or cus-

tomary to stop said hand-car when brakes were applied? A. Twenty to 40 feet.

"Q. 56. How long after said break was it before said Napole fell? A. Immediately.

"Q. 57. Where did said Napole fall relative to the position of the hand-car? A. In front.

"Q. 58. Could anything have been done to stop the car quickly that was not done? A. No.

"Q. 59. Could the said car have been stopped quick enough after the said Napole fell to prevent said Napole from being run over and receiving the injuries he did? A. No.

"Q. 60. Is it a fact that the said Napole had the same opportunity to see and discover a defect, if any there was, that others had in the handle of said car? A. Yes.

"Q. 61. Was their any defect in said car that said Napole could not have discovered by reasonable observation? A. Yes.

"Q. 62. In standing on front platform of car and holding center of wooden handle, is not the iron handle or bar directly in front and in plain sight? A. Yes.

"Q. 63. Did said Napole ever make any objections to using said car on account of any supposed defect or unsoundness in said car? A. No.

"Q. 64. How many men were in the section-gang in which said Napole was working? A. Twenty men.

"Q. 65. How many cars were in use by said gang? A. Two.

"Q. 66. At about what speed was said car running at the time of the accident? A. About seven miles an hour.

"Q. 67. Was it on an up grade or down grade at the time of the accident? A. Down grade.

"Q. 68. Was the car following the one on which Nepole was riding on an up grade or down grade at the time of the accident? A. About level.

"Q. 69. Which of the two cars was running the faster, the front or the rear car, at the time of the accident? A. About the same speed.

"Q. 70. What was the nature of the injuries received by said Napole at the time of the accident? A. Serious.

"Q. 71. Were there any vital organs of Napole's body injured, bruised or cut? If so, state fully the nature and extent of said injury. A. No.

"Q. 72. Were any of the bones of Napole's body broken? If so, state fully the nature and extent of such injury. A. Yes; the lower jaw fractured; a piece chipped off the head of the shin bone.

"Q. 73. Were the injuries which said Napole received, of themselves, necessarily fatal under proper care and professional treatment? A. Yes.

"Q. 74. What was the immediate cause of the death of said Francesco Napole? A. Blood-poisoning.

"Q. 75. Is it not a fact that the principal injury received by said Francesco Napole was to the right leg close to the knee? A. Yes.

"Q. 76. Is it not a fact that immediately after said accident said Napole was taken to the hospital at Ottawa, Kas., and there placed under the care and treatment of a competent surgeon, one C. W. Nash? A. No.

"Q. 77. Did said surgeon render or offer reasonable care and competent treatment of the said injuries in said Napole? A. Yes, when he arrived there.

"Q. 78. Is it not a fact that blood-poisoning resulted from the injury to said Napole's knee, and that such fact was communicated by said surgeon to said Napole, with the statement that, in order to save the life of said Napole, it was necessary to amputate the limb on which said injury was received, above said knee? A. Yes.

"Q. 79. Did not said surgeon offer and desire to amputate said limb, believing it to be the only means of saving the life of said Napole? A. Yes.

"Q. 80. Is it not a fact that said Napole refused to allow said limb to be amputated? A. Yes.

"Q. 81. Is it not a fact that said Napole refused to allow any surgical operation to amputate his leg or take out a diseased bone? A. Yes.

"Q. 82. Is it not a fact that the cause of the death of said Napole was from blood-poisoning resulting from the injury to his knee or leg? A. Yes.

"Q. 83. Is it not a fact that he could have lived or survived said injury if he had submitted to amputation as requested by the surgeon? A. No.

"Q. 84. Was one J. A. Justice, assistant roadmaster, having charge of the men and road-work on the line of defendant's road from Wilder, Kas., to Leavenworth? A. Yes.

"Q. 85. Was said J. A. Justice, assistant roadmaster, the person who furnished the men working on the sections along said line of road with hand-cars and other tools for their work? A. Yes.

"Q. 86. Was said assistant roadmaster the person in defendant's employ to whom reports were made and required to be made of any defect in machinery or tools used by said men that become in bad order for use? A. Yes.

"Q. 87. Did said assistant roadmaster furnish said hand-car from which said Napole fell for said use about a week or 10 days prior to said injury? A. Yes.

"Q. 88. At the time said hand-car was so furnished for use, so far as said roadmaster could discover from inspection of the same, was it in good order? A. Yes.

"Q. 89. Did said roadmaster, at the time said hand-car was so furnished for use, examine the same and believe it was in good order and safe for use by the men on said section? A. Yes.

"Q. 90. Did said assistant roadmaster have notice from anyone, after said hand-car was furnished for use on said section and prior to said injury, that said hand-car was in bad order, or that it had become unsafe while being used on said section? A. No.

"Q. 91. Is it not a fact that the injury to said Napole was the result of an accident incident to the ordinary hazards of the business in which he was engaged? A. No.

"Q. 92. Is it not a fact that the injury to said Napole was an accident happening suddenly, which no one could by ordinary care foresee and prevent? A. No.

"Q. 93. Were the hand-cars used in said work run by the section-hands themselves, and did they have the same opportunity of seeing and discovering any defects that the foreman or roadmaster had of seeing and discovering same, if any existed? A. Yes.

"Q. 94. When the men went to their work and came from it, did the men take such car as was nearest without special direction from the boss? A. Yes.

"Q. 95. Was the handle or lever on the two cars in use, including the one from which Napole fell, made of wrought iron? A. Yes.

"Q. 96. Are such wrought-iron handles susceptible of being bent and straightened without injury? A. No.

"Q. 97. Were the duties of the foreman of the gang, Fitzgerald, to stay with the men when at work and direct how their work should be done? A. Yes.

"Q. 98. Was the work of the section-gang of which Napole was a member at the time of the accident, making ditches on the right-of-way, in Leavenworth county? A. Yes.

"Q. 99. Was the hand-car stopped in about two to five feet when said Napole fell? A. Yes.

"Q. 100. How many feet does a hand-car ordinarily run after brake is applied to stop it when going same speed the hand-car was from which Napole fell? A. Twenty to 40 feet.

"Q. 101. Was the cause of the fall of said Napole the sudden breaking of the handle or lever of the car that he was working at the time? A. Yes.

"Q. 102. Was said fall in front and under the car the cause of his injuries? A. Yes.

"Q. 103. Was the handle that broke the same handle on the same car that was bent on the Sunday previous to the accident? A. Yes.

"Q. 104. If you answer question 103 in the affirmative, was not such bend in the handle repaired by the employees of the defendant prior to the accident in such manner as to appear as fit for use as before it was bent? A. Yes.

"Q. 105. While at the hospital at Ottawa was the

said Napole requested by the surgeon in charge to have his leg amputated above the knee?   A.  Yes.

"Q. 106.  Was said Napole informed and did he understand that such amputation was necessary to and would probably save his life?   A.  Yes; through priest.

"Q. 107.  Did said Napole refuse to have such amputation performed?   A.  Yes.

"Q. 108.  Had said Napole permitted the operation to be performed, as requested by the surgeon on the 17th day of August, 1888, and for several days thereafter, would it probably have saved his life, or prevented his dying from the injury?   A.  The experiment was not tried."

The general verdict of the jury awarded damages to the plaintiff in the sum of $4,000.   Motions for judgment in favor of the railroad company on findings of fact and also for a new trial were made and overruled.   The *Railroad Company* excepted to the rulings, and brings the case here for review.

*A. A. Hurd*, and *Mills, Smith & Hobbs*, for plaintiff in error.

*John A. Hale, John O. Fife, S. W. McCaslin*, and *Harkless & O'Grady*, for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J. :  The main contention of the railroad company is, that the special findings of fact do not justify the verdict of the jury or the judgment of the court.   We cannot confine our consideration, however, to the mere findings returned in answer to the special questions which were submitted to the jury at the instance of one of the parties.   Although a great number of questions were submitted at the request of the railroad company, the answers or findings do not embrace all of the testimony, nor purport to completely

cover the entire case, as was done by the general verdict. To determine whether the general verdict is sufficiently supported, we must look to the testimony as well as the findings, and when they are considered together they appear to be sufficient to establish a liability against the company, and to justify the result that was reached.

Napole was one of a crew of about 20 men who were employed in surfacing a track for the railroad company near Lansing, Kas., and they were in charge of William Fitzgerald, as foreman, or boss, as he was termed, and of Perry Davis, who acted as second boss and controlled and directed the men when Fitzgerald was not present. They traveled to and from their work on two hand-cars provided by the company, 10 of the men usually riding on each car. On the day of the casualty they went about 10 miles from their boarding-car to the place of work, and while returning in the evening Napole and nine others were riding on the front car, accompanied by Fitzgerald, the boss, while the second boss, Perry Davis, was riding on the second car with the other workmen. Napole stood with his back in the direction the car was moving, working the handle of the car up and down, when suddenly the metal lever to which the handle was fastened broke, throwing him in front of the car, where he was run over and received serious injuries, which resulted in his death a few days afterward. To account for the defect and the injury, it was shown that, on the day before, which was Sunday, several of the men went to Leavenworth for provisions, with the permission of the foreman, but Napole was not one of them, and when they reached that place the hand-car on which they rode was placed so near the main track of the railroad that an incoming train struck it, turned

it over, and the lever of the car was found to be bent and injured by the collision.    There is testimony that, within a brief time and before the car was taken from Leavenworth, the bend or defect in the lever was seen by Fitzgerald, Davis, and also by the assistant roadmaster, J. A. Justice.    The injured car was placed on the track, taken a short distance, when Davis, one of the foremen, took the lever from the car and straightened it when it was cold with a heavy hammer.    Testimony was offered tending to show that the bending and straightening of the lever while cold would have a tendency to break the fibers and materially weaken the iron, and that the resulting defect might not be apparent upon the surface by a casual observation.    It does not appear that Napole was informed or had any knowledge of the injury to the lever, and it was shown that the defect was such that he could not have discovered it by reasonable observation.    Prior to the collision the hand-car was in good repair and suitable for the use for which it was intended, and upon the day of the injury it appears that a casual glance would not have revealed anything indicating that the lever was not sound or strong enough for the use to which it was put.    It is contended that the defect in the lever was a latent one, which could not be detected by an ordinary inspection, and that as the company had no knowledge of the defect and it was not discoverable by the exercise of ordinary care, it cannot be held liable.    It cannot be said, however, in this case that the company was without knowledge of the impairment of the hand-car.    The evidence showed that the defect was immediately brought to the attention of both the foremen as well as of Justice, the assistant roadmaster, and Fitzgerald actually rode on the car himself after the

lever had been bent and before it had been straight-
ened.   One of the witnesses states that when the de-
fect was discovered by the assistant roadmaster, he
told Perry Davis, the second foreman, that if he did n't
fix it, he would have it to pay for.

It was the duty of the railroad company not only
to furnish reasonably safe machinery and appliances
for the operation of its road, but to use

1. Death of em-
ployee—duty
of employer.
reasonable care and diligence to maintain
them in such condition.   Of course, if the
defect is one which suddenly appears, the

2. Defective
tool—com-
pany, when
negligent—
when not.
company will not be deemed to be neg-
ligent unless it has been remiss in testing
the appliance, or knew or ought to have
known of the defects which caused the injury.   In
*Railroad Co. v. Jones*, 30 Kas. 601, a case similar in
many respects to the present one, it was said to be
the undoubted duty of the company not only in the
first instance to make reasonable efforts to supply
machinery, tools and appliances safe and sufficient,
but also to make like efforts to keep such machinery,
tools and appliances in good condition, and to this
end must make all reasonable and necessary inspec-
tions and examinations.   In that case it was held
that the foreman in charge of a gang of men who
were engaged in surfacing a track represented the
company, for whose knowledge or means of knowledge
the company is responsible.   Here, the company can-
not escape responsibility, for several of those repre-
senting it had actual knowledge of the collision and
that the lever was bent and out of repair.   Although
possessed of this knowledge, no pains were taken to
ascertain the effect of the impairment, and instead of
sending it to the shop to be repaired in an approved
way so as to make it reasonably safe for use, it was

straightened while cold, and in a manner likely to weaken and break the fiber of the iron.    While it was apparently sound and fit for use after it had been straightened, the fact is that it was weakened and that it did break by reason of the impairment, and the injury of Napole was the result.    While the defect was not easily discoverable after it had been straightened, and while Napole did not discover it, it had

3. Company, negligent.  been discovered by those in charge of the men, and the company is bound by the notice of such defect.

There is some contention that the special findings are inconsistent with one another and with the general verdict, and that some of them are not sustained by the testimony.    There were 108 questions submitted to the jury, some of which were involved and puzzling, but while there is some confusion in the answers we think a fair construction of all the questions and answers shows that the jury understood the issues in the case, and that their findings are reasonably consistent with one another and with the general verdict.    In regard to the knowledge of the company, it is claimed that the jury found that the assistant roadmaster was the person upon whom notice should have been served in order to bring knowledge of the defect home to the company, whereas the notice was in fact brought to the foreman of the crew.    The jury did find that the assistant roadmaster was the agent to whom reports were made in respect to defects in machinery or tools that became in bad order for use, but they also found that notice of the defect was brought home to Fitzgerald, the foreman, and that he was an agent of the company upon whom notice of the defect could be properly served in order to bind the company.    They found that while there was no evidence as to what

opinion Fitzgerald held as to the safety of the lever after it had been straightened, he saw the car and rode upon it after it was injured, and therefore had knowledge of its defective condition. This finding is explained by the testimony that Fitzgerald not only saw the car shortly after the lever was bent, but that he rode upon it for a short distance before the attempt was made to repair it. Aside from this, we have testimony that notice of the defect was brought to the attention of both the assistant roadmaster and the other foreman, and although all three knew of the defect, all were aware that it had not been sent to the shops to be restored to a reasonably safe condition by proper repairs. We think the testimony is sufficient to sustain the special findings of the jury and the general verdict which they returned.

It is next contended that the action cannot be maintained by the widow who is and was a resident of Missouri, because the injury occurred in August, 1888, before the passage of § 1 of chapter 131 of the Laws of 1889, authorizing the bringing of an action under § 422 of the code by the widow where no personal representative had been appointed. The later provision of the statute is supplemental to section 422, and is intended to make an existing cause of action available where the deceased was a non-resident of the state, or where, being a resident, no personal representative is or has been appointed. It has been held that the amendment does not create a new cause of action nor impose any limitation on an existing one.

4. Civil code, § 422 — action by non-resident.

It simply changes the remedy, by providing that the cause of action given by § 422 shall not be lost on account of the non-residence of the deceased or the non-appointment of a personal representative. ( *Berry v. Railroad*

*Co.*, 52 Kas. 769.) No error was committed by the court in overruling the demurrer·to the petition of the widow or in refusing to sustain the objection of the railroad company to all evidence offered by her.

We find nothing substantial in the objections to the instructions nor in the claim that the conduct of counsel for defendant in error in the argument of the case to the jury was prejudicial.

The judgment of the district court will be affirmed.

All the Justices concurring.